| | | |
|---|---|---|
| Joseph Baskins, | ) | |
| | ) | |
| Plaintiff, | ) | No. 17 C 07566 |
| | ) | |
| v. | ) | |
| | ) | Judge Edmond E. Chang |
| Patrick Gilmore, Michael R. Kelly, | ) | |
| Marc Jarocki, Unknown Chicago | ) | |
| Police Department Employees, and | ) | |
| the City of Chicago, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

In Fall 2014, Joseph Baskins went to Chicago City Hall with his fiancée to get married. R. 31, Am. Compl. ¶¶ 2, 18-19.[1] But Baskins and his companions encountered Chicago Police Department (CPD) Officers Patrick Gilmore, Michael R. Kelly, and Marc Jarocki at a nearby parking garage. *Id.* ¶¶ 21-22. According to Baskins, the officers made racist comments against Baskins and punched Baskins without provocation, resulting in a fistfight during which Gilmore pulled out his gun. *Id.* ¶¶ 28, 30-32. Baskins recovered the gun after a friend kicked it away from Gilmore; Baskins took the gun back to his home, intending to surrender it (and himself) the next day. *Id.* ¶¶ 33-35, 47-49. Before he could do so, Baskins was arrested and charged with unlawful possession of a firearm by a felon. *Id.* ¶¶ 50, 52, 56. After three years of criminal proceedings, the State dropped the charge in July 2017. *Id.*

---

[1]Citations to the record are noted as "R." followed by the docket number and, where necessary, the page or paragraph number.

¶¶ 57, 62. Baskins now brings suit against the officers, as well as unknown Chicago Police Department employees and the City of Chicago, alleging nine counts: a federal due-process malicious prosecution claim, 42 U.S.C. § 1983 (Count 1); § 1983 claims for conspiracy to deprive him of constitutional rights and for a violation of due process (Counts 2 and 3); a *Monell* claim against the City of Chicago (Count 4); state law claims for malicious prosecution, intentional infliction of emotional distress, and civil conspiracy (Counts 5, 6, and 7); and state law claims for *respondeat superior* and indemnification against the City (Counts 8 and 9). Kelly and Jarocki filed a cross-claim against Chicago, alleging claims for *respondeat superior* and indemnification.[2] R. 56, Cross-Complaint. The City has moved to dismiss Baskins' claims for failure to adequately state a claim, R. 33, Mot. Dismiss, and to dismiss the Cross-Complaint on the same ground, R. 73, Mot. Dismiss Cross-Compl. For the reasons discussed below, the dismissal motions are largely denied, although Baskins cannot proceed on every *Monell* theory presented in the Amended Complaint.

## I. Background

For purposes of this motion, the Court accepts as true the allegations in the Amended Complaint. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007). Joseph Baskins was

---

[2]Baskins filed a position statement asking that the Court consider Kelly and Jarocki's respective answers and Cross-Complaint when deciding the City's motion to dismiss the Amended Complaint. R. 63. The Court declines to do so for two reasons. First, as discussed later in this Opinion, Baskins on his own plausibly pleaded that the Defendant Officers acted within the scope of their employment, so it is not necessary to consider the allegations in the other pleadings. Second, Baskins presented no authority, and this Court could find none, that allowed a plaintiff to incorporate facts from an opposing party's pleadings in response to a motion filed by a different defendant, let alone cherry pick favorable, consistent facts, while disavowing harmful, inconsistent facts.

at Chicago City Hall on October 30, 2014 with his fiancée to get married; he was accompanied by two friends and his baby. Am. Compl. ¶¶ 2, 18-19. When he arrived at City Hall, Baskins and his companions learned that the pertinent City office was closed for lunch, so they left and got on an elevator to the parking garage. *Id.* ¶¶ 20-21. Three white men (later identified as Officers Gilmore, Kelly, and Jarocki) got into the elevator with Baskins and his companions. *Id.* ¶¶ 21-22. Inside the elevator, one of the officers made multiple racist comments (Baskins and his companions are black). *Id.* ¶¶ 28, 102(d). Once the elevator arrived at the garage level, Gilmore punched Baskins in the mouth without provocation. *Id.* ¶¶ 30-31. Baskins defended himself, and he and Gilmore ended up grappling on the ground. *Id.* ¶ 32. At some point during the fight, Gilmore pulled out a gun and pointed it at Baskins from behind, but one of Baskins' friend kicked it away from Gilmore. *Id.* ¶¶ 33-34. Fearing for his companions' lives, Baskins picked up the gun and ran. *Id.* ¶ 34.

It turns out that the officers had been in City Hall to meet with two City of Chicago Law Department attorneys about another civil rights lawsuit. Am. Compl. ¶ 23. Before encountering Baskins, the officers had drank alcohol at a nearby bar. *Id.* ¶¶ 24-25. Baskins alleges that the officers were on duty at the time of their encounter. *Id.* ¶ 27. After the altercation, the officers returned to the City Attorneys' office, where one of the attorneys allegedly offered them gum to hide the smell of alcohol on their breath. *Id.* ¶¶ 39-40.

Eventually, Baskins was arrested and detained for two weeks in Lake County on suspicion of aggravated robbery and aggravated assault on a police officer,

although he was never charged with either offense. Am. Compl. ¶¶ 50-53. Baskins was later transferred to Cook County, where he was questioned for two days, then charged with unlawful possession of a firearm by a felon. *Id.* ¶¶ 55-56. Three years of criminal proceedings followed. *Id.* ¶ 57. Finally, on July 6, 2017, after a rejected plea offer, the State dropped the charge against Baskins. *Id.* ¶¶ 60-63.

In the Amended Complaint, Baskins alleges that the Defendant Officers offered an alternative version of what happened in the elevator to cover up their misconduct.[3] Am. Compl. ¶¶ 36-38. The officers asserted that they smelled marijuana upon encountering Baskins and his companions in the elevator, and that they were attempting to arrest Baskins on the belief that he possessed marijuana (Baskins contends that neither he nor his companions possessed or smelled like marijuana). *Id.* ¶¶ 36-37. The officers also contended that Baskins and his group were the aggressors of the altercation. *Id.* ¶ 38. Baskins alleges that the officers initiated the criminal prosecution against Baskins in order to cover up their misconduct. *Id.*

Since the time of the altercation between Baskins and the officers, Gilmore has taken disability and left the CPD, and has asserted that he suffered brain damage during the fight. Am. Compl. ¶¶ 64-65. Baskins alleges that Gilmore remembers acting in the course of his duty as a law enforcement official during the incident but does not remember details about what he did before the attack. *Id.* ¶¶ 66-67. Jarocki and Kelly are both on administrative leave pending an investigation of their conduct

---

[3]The version of events presented in Kelly and Jarocki's Cross-Complaint is similar to the alternative version presented by the Defendant Officers as alleged in Baskins' Amended Complaint. *See* Cross-Compl. at 4-9. The Court will note the relevant allegations in Section III(C) in its analysis of the City's motion to dismiss the Cross-Complaint.

in this matter. *Id.* ¶¶ 68-69. The two City Attorneys resigned their positions after a Chicago Inspector General investigation of their conduct in this matter. *Id.* ¶ 70.

Based on these allegations, Baskins brought nine claims against the various Defendants in his Amended Complaint. As pertinent to the City's motion to dismiss, Baskins brings a *Monell* claim against the City for failing "to promulgate express policies, allow[ing] widespread practices and customs to persist, and t[aking] actions through its final policymakers, which resulted in the violation of Plaintiff's rights." (Count Four). Am. Compl. ¶ 93. Baskins also seeks to hold the City liable for the state law claims under the theory of *respondeat superior* (Count Eight), *id.* ¶¶ 146-48, and also alleges that the City is required to pay any judgment entered against the officers under Illinois's indemnification law (Count Nine), *id.* ¶¶ 149-52. Officers Kelly and Jarocki's Cross-Complaint alleges that both officers were acting within the scope of their employment at all relevant times, so the City of Chicago, as their employer, is liable for any state law claims committed by the officers under *respondeat superior* (Cross Counts Two and Four), Cross-Compl. at 11, 14, and is required to indemnify them for any (non-punitive-damages) judgment under 745 ILCS 10/9-102 (Cross Counts One and Three), *id.* at 9, 13.

The City now moves to dismiss all claims against it in the Amended Complaint, Mot. Dismiss, and to dismiss the entirety of Jarocki and Kelly's Cross-Complaint, Mot. Dismiss Cross-Compl.

## II. Standards of Review

Under Federal Rule of Civil Procedure 8(a)(2), a complaint generally need only include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). This short and plain statement must "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (alteration in original) (internal quotation marks and citation omitted). The Seventh Circuit has explained that this rule "reflects a liberal notice pleading regime, which is intended to 'focus litigation on the merits of a claim' rather than on technicalities that might keep plaintiffs out of court." *Brooks v. Ross*, 578 F.3d 574, 580 (7th Cir. 2009) (quoting *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 514 (2002)).

"A motion under Rule 12(b)(6) challenges the sufficiency of the complaint to state a claim upon which relief may be granted." *Hallinan v. Fraternal Order of Police of Chi. Lodge No. 7*, 570 F.3d 811, 820 (7th Cir. 2009). "[A] complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). These allegations "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. The allegations that are entitled to the assumption of truth are those that are factual, rather than mere legal conclusions. *Iqbal*, 556 U.S. at 678-79.

### III. Analysis

### A. *Monell* claim

On the one hand, *Monell* claims are not subject to any heightened pleading standard, and need only plead sufficient facts to put the municipality on notice of the gravamen of the claims. *Latuszkin v. City of Chi.*, 250 F.3d 502, 504 (7th Cir. 2001). On the other hand, a plaintiff must "provide some specific facts" to support his *Monell* claim and cannot simply rely on legal conclusions and conclusory allegations. *McCauley v. City of Chi.*, 671 F.3d 611, 616 (7th Cir. 2011) (cleaned up);[4] *see also Elsayed v Vill of Schaumburg*, 2015 WL 1433071, at *5 (N.D. Ill. Mar 26, 2015) (simply reciting the elements of a *Monell* claim in a complaint was inadequate without sufficient associated facts).

To survive the City's dismissal motion, Baskins must adequately plead that he suffered a deprivation of his substantive constitutional rights, and that the deprivation was caused by a municipal policy or custom (that is, the municipality was the "moving force" behind the alleged injury). *See Latuszkin*, 250 F.3d at 503-05. The official policy or custom can take the form of: (1) an official municipal policy; (2) "a governmental practice or custom that, although not officially authorized, is widespread and well settled"; or (3) a decision by a municipal agent with final policymaking authority. *Thomas v. Cook Cty. Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2010) (citing *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 690

---

[4]This opinion uses (cleaned up) to indicate that internal quotation marks, alterations, and citations have been omitted from quotations. *See* Jack Metzler, *Cleaning Up Quotations*, 18 Journal of Appellate Practice and Process 143 (2017).

(1978)). Baskins contends that he has alleged facts supporting all three theories of liability. R. 49, Pl.'s Resp. at 4. The City argues that his claims fail under *every* prong. Mot. Dismiss at 1. The answer is in between: as explained below, Baskins has adequately pled that the City had an unofficial but widespread policy of failing to discipline officers, and that the City had a widespread "code of silence" under which CPD officers do not report other officers' misconduct and then fabricate evidence or charges to cover up that misconduct. But the Amended Complaint fails to adequately plead *Monell* liability based on an official City policy, on a decision by a final policymaker, and on several other widespread-practices theories.

### 1. Practice or Custom

A municipality is liable for a plaintiff's constitutional injuries if they are caused by a widespread practice "so permanent and well-settled that it constitutes a custom or practice" of the municipality. *Estate of Sims ex rel. Sims v. Cty. of Bureau*, 506 F.3d 509, 515 (7th Cir. 2007). Although the Seventh Circuit has declined to "adopt any bright-line rules defining a widespread custom or practice," generally a plaintiff must allege more than one, and sometimes more than three, instances of misconduct. *Thomas*, 604 F.3d at 303 (cleaned up). These other instance of misconduct also must be similar enough to the complained-of constitutional violations to make it plausible that that particular custom or practice had the force of law. *See Calhoun v. Ramsey*, 408 F.3d 375, 380 (7th Cir. 2005); *Hicks v. City of Chi.*, 2017 WL 4339828, at *9 (N.D. Ill. Sept. 29, 2017) (facts that "have no direct or inference-generating connection" to the alleged constitutional violation cannot support a widespread practice claim).

Simply alleging these other instances occurred is insufficient: Baskins must adequately allege (and, ultimately, prove later in the case) how the *City*, and not just the individual Chicago police officers, was responsible for causing his constitutional deprivations. *See Wilson v. Cook Cty.*, 742 F.3d 775, 779 (7th Cir. 2014) ("[T]o establish municipal liability, a plaintiff must show the existence of an official policy or other governmental custom that not only causes but is the moving force behind the deprivation of constitutional rights.") (cleaned up). In other words, at least in the context of this case, City policymakers must be "deliberately indifferent" to known or obvious consequences of the custom. *Thomas*, 604 F.3d at 303. That is, the policymakers "must have been aware of the risk created by the custom or practice and must have failed to take appropriate steps to protect the plaintiff." *Id.*

### a. Code of Silence

Baskins alleges that the Chicago Police Department maintained—and the City was aware of and condoned—a "code of silence" under which officers remain silent about other officers' misconduct and cover up that misconduct by fabricating or manipulating evidence, or by bringing false charges, and do so without fear of reprisal.[5] Am Compl. ¶¶ 103, 108, 112, 129. In support of the existence of the code, Baskins proffers examples within the past seven years or so of his encounter with the Defendant Officers in October 2014. One is *Obrycka v. City of Chicago*, 913 F. Supp.

---

[5]Baskins and the City consider the widespread "code of silence" theory under the broader "failure to train, supervise, or discipline" theory. As other courts have noted, often plaintiffs allege facts supporting "a set of interrelated, mutually-reinforcing customs or practices, all of which contribute to civil rights violations" by the police department. *Spearman*, 230 F. Supp. 3d at 893. So there is no one "correct" way to plead or to analyze the facts supporting the theories behind a plaintiff's *Monell* claims.

2d 598, 604 (N.D. Ill. 2012), Am. Compl. ¶ 109(b), in which a federal jury found that as of February 2007 (when the civil rights violation happened in that case), the City "had a widespread custom or practice of failing to adequately investigate and/or discipline its officers and/or of a police code of silence." *Obrycka*, 913 F. Supp. 2d at 604. The jury did not specify which of these two bases was the premise of the verdict in the plaintiff's favor, so it is not crystal clear which custom the jury found was proven. That said, Baskins' case is at the pleading stage, so the evidence presented to the *Obrycka* jury can be considered as factual allegations in support of Baskins' code-of-silence theory. The plaintiff in *Obrycka* introduced evidence that officers who investigated an off-duty officer's battery of a bartender omitted from their police report that the aggressor was a police officer and that the incident was captured on videotape, despite being told those facts. *Id.* at 603. The bartender also presented evidence that, within hours of the beating, her attacker (the off-duty officer) made many phone calls, including to his police partner, who called numerous other CPD officers, including one of the investigating officer's partner. *Id.* Yet the misconduct and the video's existence were not reported, so a code of silence could be inferred.

Baskins also alleged other examples of a Chicago police code of silence. First, the City paid to settle a lawsuit alleging that the code of silence enabled an officer to kill a person while he was driving drunk, because the Chicago police allegedly hid evidence of the officer's role in the death, and also hid his past record of alcohol-based misconduct. Am. Compl. ¶ 109(d) (citing *Manzera v. Frugoli*, No. 13-cv-0526 (N.D. Ill.)). Also, Baskins points to findings from a 2017 United States Department of

Justice report that the Independent Police Review Authority (IPRA, which has now been replaced by a new agency) and CPD's Bureau of Internal Affairs (BIA) treated police officers' fabrication or manipulation of evidence as "ancillary and unexceptional misconduct, and often do not investigate it, causing officers to believe there is not much to lose if they lie to cover up misconduct." Am. Compl. ¶ 112 (citing DOJ Report at 8). The DOJ report also concludes that there is a "higher standard to sustain claims against officers for making false statements," and that investigators rarely charge officers for lying to cover up misconduct. *Id.*

Baskins also alleges, as he must, specific facts that (if proven) would allow a reasonable factfinder to conclude that the City was deliberately indifferent to the consequences of the widespread code-of-silence (assuming that too was proven). *Thomas*, 604 F.3d at 303. In addition to IPRA and BIA's alleged knowledge of the practice of hiding police misconduct by fabricating evidence (or remaining silent), Baskins alleges additional examples of City policymakers' awareness of the code of silence. First, Baskins points to Mayor Rahm Emanuel's acknowledgement in a December 2015 statement "that a 'code of silence' exists within the Chicago Police Department." Am. Compl. ¶ 108(a); *see Spearman v. Elizondo*, 230 F. Supp. 3d 888, 894 (N.D. Ill. 2016). Second, Baskins alleges that a year later, in December 2016, the president of the police officers' union in Chicago acknowledged the code's existence. Am. Compl. ¶ 108(b). The union's acknowledgment of the code is of course not the same as a City policymakers' concession, but it gives rise to a plausible inference (at least at the pleading stage, when detailed *evidence* is not required) that if even the

police union's president admits to the code's existence, City policymakers would know about it too. Finally, Baskins pleads that the DOJ report also said that current officers of the CPD and former high-level officials of the CPD interviewed during the DOJ's investigation acknowledged a code of silence. *Id.* at ¶ 108(c); *see* Report at 75, https://www.justice.gov/opa/file/925846/download (a current CPD sergeant stated that "if someone comes forward as a whistleblower in the Department, they are dead on the street.").

With those factual allegations as a premise, Baskins alleges that the City "had notice of widespread practices and customs of Chicago Police officers under which … citizens were arrested for, charged with, and prosecuted for crimes by members of the [CPD] without probable cause, based on false evidence, and without being provided exculpatory evidence in the possession of the [CPD]." Am. Compl. ¶ 97; *see also id.* ¶¶ 108, 110 ("The failure of police supervision and discipline in the City of Chicago during the relevant time period, and the persistence of a code of silence, has been admitted by City policymakers and by Chicago Police Officers, … [but the City] has taken no action to ensure that police officers who commit misconduct are disciplined."). Baskins also asserts that the City's widespread practices and customs resulted in the violations of Baskins' constitutional rights. *Id.* ¶ 100. Of course, the Court need not accept legal conclusions—like Baskins' allegation that the City's policy caused the deprivation of his rights. *See Hicks*, 2017 WL 4339828, at *9. But the conclusory allegations have a factual-allegation foundation, as detailed earlier. At the dismissal-motion stage, this is enough to adequately plead that the City knew

about the code of silence and that the code emboldened officers to engage in misconduct and cover it up, so the City could be deemed the "moving force" behind the violations. *See Spearman*, 230 F. Supp. 3d at 894 (holding similar allegations were sufficient to allege *Monell* liability). Baskins need not allege that the Defendant Officers conspired with City policymakers themselves (though Baskins does give that a shot, to no avail as discussed below), nor that the City expressly knew of and condoned the officers' particular actions in *this* case. *See Spearman*, 230 F. Supp. at 895. That is the point of a liability theory premised on a *widespread* practice: it is so widespread that the City cannot evade *Monell* liability just because they do not explicitly know all of the specific victims of the underlying violation.

The City argues that the examples provided by Baskins are not similar enough to the alleged facts of his case, and the City cites case law that relies on dissimilarity to reject a *Monell* claim. Mot. Dismiss at 6-9. But each of the cited cases are distinguishable, because each plaintiff in those cases presented substantially less factual support, or only alleged completely dissimilar prior instances of misconduct, in support of their widespread practice claims. *See, e.g., Boone v. City of Chi.*, 2018 WL 1014509, at *1-2 (N.D. Ill. Feb. 22, 2018) (plaintiff alleged only a single paragraph of conclusions, and the only factual allegation related to complaints against the defendant-officers with no information about the subject matter of the complaints); *Carmona v. City of Chi.*, 2018 WL 306664, *2-3 (N.D. Ill. Jan. 6, 2018) (plaintiff did not allege any instances of police-interrogation conduct or instances similar to his interrogation, and failed to plead any supporting facts that the City failed to train or

discipline officers); *Willis v. Otten*, 2013 WL 6730760, at *2 (N.D. Ill. Dec. 19, 2013) (plaintiff alleged only conclusory allegations, failing "to put forth enough facts to raise a reasonable expectation that discovery will reveal evidence of the City's condoning a code of silence"); *Mikolon v. City of Chi.*, 2014 WL 7005257, at *4-5 & 4 n.8 (N.D. Ill. Dec. 11, 2014) (same).

In contrast, here the Amended Complaint contains enough factual allegations of prior instances of misconduct that are similar enough to the misconduct at issue in this case. Baskins alleges that the Defendant Officers were on duty at the time of the incident, Am. Compl. ¶ 27, which is a fact that the Court must accept as true for purposes of evaluating the motion to dismiss, despite the City's argument that the Defendant Officers were "off the grid," Mot. Dismiss at 6-7. Next, Baskins alleges that the officers fabricated a reason for engaging with Baskins and his companions: the officers stated that they were attempting to effectuate an arrest after smelling marijuana in the elevator, which would qualify as an official police action. *Id.* ¶¶ 36-37. This is similar enough to the alleged prior instances of fabricating evidence in order to cover-up police misconduct. Relatedly, the officers "claimed that Baskins and his group were the aggressors, and initiated criminal action against Baskins as a means of covering up their actions." *Id.* ¶ 38. That too is similar to prior instances of alleged misconduct. In the same vein, Baskins alleges that the officers worked with two City Attorneys after the altercation "to suppress [the Defendant Officers'] misconduct and in doing so ensured that false criminal charges would be filed against Plaintiff." *Id.* ¶ 127; *see also id.* ¶ 128. All of this is similar enough to the alleged prior

instances of the code of silence in operation, so this *Monell* theory of liability survives.[6]

### b. Wrongful Convictions

Next, Baskins attempts to rely on several wrongful convictions, mostly from the distant past, to support a *Monell* theory. *See* Pl.'s Resp. at 10. This version of *Monell* liability is not adequately pled. In the cases cited by Baskins, the convictions were overturned because CPD officers fabricated or suppressed evidence to obtain false convictions: the officers did so not to conceal their own (or other officers') misconduct, as alleged here by Baskins, but rather in an attempt to solve crimes (despite the unconstitutional way that they went about doing that). Am. Compl. ¶ 102(e). As discussed earlier, allegations of past misconduct must be similar enough to the misconduct alleged by the plaintiff in order to sustain a widespread practices theory under *Monell. See Gill v. City of Milwaukee*, 850 F.3d 335, 344 (7th Cir. 2017) (plaintiff neither "provid[ed] examples of other [] police officers taking actions similar to those complained of here," nor "plausibly allege[d] that such examples exist[ed]" and thus failed to plead a *Monell* claim); *Thomas v. City of Markham*, 2017 WL 4340182, at *4 (N.D. Ill. Sept. 29, 2017) ("[A]llegations of general past misconduct or

---

[6]To be sure, every plaintiff who bases a *Monell* claim on the code of silence will not be able to attribute a Chicago police officer's allegedly unconstitutional actions to the code—the requisite similarity between the oft-cited examples of the code and the City's knowledge of it (the *Obrycka* verdict, Mayor Emanuel's December 2015 statement, the 2017 DOJ report; *see Spearman*, 230 F. Supp. 3d at 893-94; *Powell v. City of Chi.*, 2018 WL 1211576, at *9 (N.D. Ill. Mar. 8, 2018)), will not always exist. The passage of time and recent police-reform attempts also will start to undermine the plausibility of the inferences to be drawn from past instances of misconduct, because the relevant City policymakers would no longer be deliberately indifferent to the code.

allegations of dissimilar incidents are not sufficient to allege a pervasive practice and a defendant's deliberate indifference to its consequences."). Cases in which CPD officers generally falsified evidence or secured false confessions in order to solve a crime or close a case is not closely analogous enough to the alleged misconduct here, namely, that the officers falsified testimony to cover *their* own misconduct, causing Baskins to be prosecuted for a crime that he did not commit. There was no crime period, on Baskins' version, which is quite different than a case involving a real crime that police officers fabricate evidence to "solve." Wrongful convictions of this sort are not an adequate basis for the *Monell* claim here, so there need not be any discovery of this version of liability.

### c. Failure to Discipline

The code-of-silence theory is closely related to Baskins' argument that the City failed to discipline officers for misconduct on a widespread basis. The discipline-failure theory again requires Baskins to allege enough similar examples to give rise to the inference that the City was deliberately indifferent to the risks of failing to discipline officers for misconduct. *See, e.g.*, *Turner v. M.B. Fin. Bank*, 2017 WL 4390367, at *9 (N.D. Ill. Oct. 3, 2017). Baskins alleges that CPD officers engage in misconduct, fail to report it, and cover up it up because the widespread failure to discipline assures them they can do so with impunity. Am. Compl. ¶¶ 103, 110, 124. Just as with the code of silence, Baskins has alleged enough specific facts and examples to sufficiently plead a widespread failure to discipline officers for engaging in the kind of misconduct alleged by Baskins.

As discussed earlier, the verdict in *Obrycka*, 913 F. Supp. 2d at 603, was either based on the code of silence or the failure to discipline (or possibly both). Once again, at least at the pleading stage, the expert reports offered in that case, which opined that the Chicago police discipline system was systemically deficient and very rarely resulted in discipline as compared to other police departments, *Obrycka*, 2012 WL 601810, at *7-8, can be counted as prior examples of the discipline-failure *Monell* theory. Am. Compl. ¶ 109(b).

The Amended Complaint also cites another civil lawsuit in which a jury found, in part based on the City's widespread failure to discipline officers, that the City was liable for $44.7 million in damages awarded when the defendant-officer used his service weapon to shoot a friend in the head. Am. Compl. ¶ 109(c) (citing *Laporta v. City of Chi.*, 14-cv-9665) (N.D. Ill.)). That officer was named in dozens of complaints, had multiple arrests and a record of alcohol-based misconduct, and had been named as a civil defendant six times. *Id.* Baskins also cites other examples of failures to discipline when CPD officers used excessive force.[7] For instance, IPRA found a shooting justified when a CPD officer chased and shot a man for the purported reason that he had pointed a gun at the officer, but no gun was found on the man, only in a nearby roof gutter. Am. Compl. ¶ 101(b)(ii) (citing DOJ Report at 25). In another example, an off-duty CPD officer suspected a man of burglarizing a building, and although the officer called 911, the officer did not wait for backup. *Id.* ¶ 101(b)(vi)

---

[7]As discussed in more depth below, however, Baskins fails to adequately allege that the City had an affirmative widespread practice of endorsing the use of excessive force either outside or within the course of their assigned police duties. That said, a failure to discipline misconduct is distinct and sufficiently pled.

(citing DOJ report at 25). The officer struck and kicked the suspect when the man advanced on him and alleged that the man withdrew a shiny object, which caused the officer to fire twice and kill the suspect. *Id.* But only a watch, not a weapon, was recovered near the body. *Id.* Although the officer did not wait for backup, IPRA found that the shooting was justified. *Id.* In one more example from the DOJ report, officers aggressively grabbed a woman arrested for prostitution, threw her to the ground, surrounded her, and told another officer to tase her ten times. *Id.* ¶ 101(b)(xiv) (citing DOJ report at 36). The officers used profanity and hit her while she was handcuffed and on her knees. *Id.* The officers discovered a recording device and discussed whether they could take it. *Id.* The officers falsely claimed in their reports that she had attacked them first, and supervisors approved the use of force. *Id.* Officers were not disciplined until after the woman complained to IPRA and produced surveillance video of the event. *Id.*

The City attempts to distinguish all of these examples by arguing that the Defendant Officers were not on duty or were not engaging in normal police work when they attacked Baskins without provocation after drinking in a bar. Mot. Dismiss at 6-7. As discussed below, however, Baskins alleges that the officers' version of events is that they were attempting to effectuate an arrest of him, so the officers are attempting to use official police action as a shield for their misconduct—for which they could be confident they would not be disciplined (or so the *Monell* theory goes). So the prior examples of discipline failure are sufficiently connected to what Baskins has alleged here as the moving force behind the constitutional violation.

18

Baskins also cites several findings in the DOJ report that give rise to an inference that the City failed to discipline officers on a widespread basis. Specifically, the DOJ found that "Chicago seldom holds officers accountable for misconduct." Am. Compl. ¶ 111 (citing DOJ Report at 46). The report specifically noted that the City failed to conduct *any* investigation of almost half of police-misconduct complaints, and even when there is an investigation, there are "consistent patterns of egregious investigative deficiencies that impede the search for truth," including frequently not interviewing witnesses or accused officers, or interviews biased in favor of accused officers, as well as failure to collect probative evidence. Am. Compl. ¶ 121 (citing DOJ Report at 46-47). The DOJ report goes on to say that "[i]n the rare instances when complaints of misconduct are sustained, discipline is inconsistent and unpredictable, and meted out in a way that does little to deter misconduct." DOJ Report at 46-47. The Amended Complaint cites to yet another finding of the DOJ report, namely, that within the last seven years, when a citizen makes a complaint against a CPD officer, the CPD sustains less than 2% of the complaints, meaning that officers are not disciplined 98% of the time. Am. Compl. ¶ 112 (citing DOJ Report at 8). And as discussed above, the DOJ investigation found that "IPRA and BIA treat [CPD officers'] efforts to hide evidence [of their own misconduct] as ancillary and unexceptional misconduct, and often do not investigate it, causing officers to believe there is not much to lose if they lie to cover up misconduct." *Id.* Baskins relies on another investigative report—which he does not identify in the Amended Complaint, but which the Court must accept as true at this stage—that found that since 2010,

when a CPD officer challenged discipline received from a filed grievance, the discipline was reduced or reversed 85% of the time, including going so far as *expunging* discipline for making false statements. Am. Compl. ¶ 113. Baskins also points to a 2016 Chicago Police Accountability Task Force report that, for years, "CPD has missed opportunities to make accountability an organizational priority." Am. Compl. ¶ 122. All of these allegations are further support for the discipline-failure theory of *Monell* liability.

### d. Excessive Force

Next is Baskins' argument that the City has a custom of affirmatively encouraging the use of excessive force (either through an express or an informal policy).[8] But none of the examples of excessive force, including findings from the DOJ Report, Am. Compl. ¶ 101(a)-(b) and jury verdicts or settlement agreements, *id.* ¶ 101(e), support a *Monell* theory (even at the pleading stage) that the City *affirmatively* endorsed the use of widespread force. Baskins spends much of his response arguing that he alleged such a practice. Pl.'s Resp. at 7-9. As the City points out, however, these examples of excessive force take place during an actual official police action, such as an arrest, investigatory stop, or other seizure of a suspect. R.

---

[8]Baskins also contends that he plausibly pled that the City has an express policy that caused his injuries. Specifically, he alleges the City failed "to promulgate proper or adequate rules, regulations, policies, and procedures regarding: (a) use of force against citizens by the [CPD]; [and] (b) the arrest and charging of citizens by the [CPD], including the disclosure of evidence in criminal proceedings … ." Am. Compl. ¶¶ 94-96; Pl.'s Resp. at 8 n.2 (citing *Glisson v. Indiana Dep't of Corr.*, 849 F.3d 372, 379 (7th Cir. 2017)). But *Glisson* only held that the defendant there was deliberately indifferent to the risk of failing to issue a policy. *Id.* at 381-82. Here, the Amended Complaint does not adequately supply facts on this particular theory of liability. Instead, discipline systems were nominally in place, but just not enforced.

50, Def.'s Reply at 3. That is not what Baskins pleads here: he alleges that the officers attacked him without provocation, fabricated an official reason for the attack, and then caused charges to be brought against him. Am. Compl. ¶¶ 28-30, 36-38. That conduct is too dissimilar to the excessive-force examples offered by Baskins. This theory is not adequately pled.

### e. Failure to Train and Supervise

The final widespread-practices theory is that the City failed to train and supervise CPD officers. Specifically, Baskins alleges that officers (a) were permitted to use force without proper training or supervision from those who knew what constituted permissible force; and (b) were permitted to arrest, charge, and prosecute citizens without proper training or supervision on how evidence should be collected, maintained, and transmitted to the criminal justice system, among other subjects. Am. Compl. ¶ 103. On this theory of liability, however, Baskins offers only conclusory allegations or irrelevant examples. For example, Baskins points to a March 2015 American Civil Liberties Union report stating that CPD officers were rarely trained to conduct seizures after the initial police academy training, and that there was no evidence that seizures were being supervised. Am. Compl. ¶ 105. But Baskins does not allege that *he* was the subject of an unconstitutional seizure, so those facts are irrelevant. The remaining allegations are generally stated findings from the 2017 DOJ Report. Am. Compl. ¶106 (citing DOJ Report at 93-94) (finding that CPD's failure to train officers leaves them "underprepared to police effectively and lawfully," and that their ability to "police within constitutional standards" suffers); Am. Compl.

¶ 107 (quoting DOJ Report at 105) ("[I]instead of encouraging the chain of command to instill proper policing tactics and respect for constitutional policing in CPD officers, CPD provides little incentive, or even opportunity, for supervisors to meaningfully guide and direct CPD officers."). None of these allegations relate to misconduct comprising coverups and false charges, as alleged by Baskins, but rather are general allegations that CPD officers are not trained or supervised sufficiently in "constitutional policing." That is a large umbrella, and without more specific *factual* allegations, the Amended Complaint does not adequately plead a widespread practice of failing to train or supervise CPD officers.

### 2. Policymakers

Moving on from the widespread-practice theory of *Monell* liability, Baskins next argues that the alleged constitutional violations were caused by a decision of an official with final policymaking authority. Am. Compl. ¶ 126. A municipality can be liable for the deliberate conduct of officials whose acts can fairly be said to be those of the municipality. *Pembaur v. City of Cincinnati.*, 475 U.S. 469, 481 (1986). But liability attaches "only where the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered." *Id.* The Seventh Circuit has instructed that, to determine whether an official is a final policymaker, the court must inquire into: "(1) whether the official is constrained by policies of other officials or legislative bodies; (2) whether the official's decision on the issue in question is subject to meaningful review; and (3) whether the policy decision purportedly made

by the official is within the realm of the official's grant of authority." *Vodak v. City of Chi.*, 639 F.3d 738, 748 (7th Cir. 2011) (cleaned up).

Baskins again alleges multiple theories under this version of *Monell* liability, but none can survive the City's motion to dismiss. First, the two City Attorneys are not final policymakers for the City. Even the Amended Complaint alleges that their conduct, including their involvement with Baskins' criminal case, was subject to review, as they themselves were investigated for their participation in the matter, and ultimately resigned as a result. Am. Compl. ¶ 130. So their decisions about how to handle the investigation after the altercation was "subject to meaningful review." *Vodak*, 639 F.3d at 748. The Amended Complaint also alleges that the authority that was delegated to these attorneys was to provide legal advice to CPD officers. *Id.* ¶ 127. Simply having discretion in exercising particular functions does not give rise to municipal liability; the official must be responsible for establishing final government policy about that function before the municipality may be held liable. *Pembaur*, 475 U.S. at 481-83. By receiving delegated authority to advise officers (not to make policy), it is clear—and Baskins does not allege otherwise—that although the City Attorneys did not have final authority to determine the policies underlying this advice. The City Attorneys are not final policymakers through whom municipal liability can attach.

Second, although it might be feasible in some cases that a plaintiff could invoke a final-policymaker liability theory without identifying the policymaker by name in the complaint, that is not the case here. *See* Pl.'s Resp. at 13 n.5. Apart from his

allegations about the City Attorneys' role, Baskins pleads only conclusions about other policymaking official's deliberate conduct as a cause of his injuries. Am. Compl. ¶ 126 ("[B]ased upon information and belief, individuals with final policymaking authority for the City of Chicago were directly and indirectly involved in the violation of Plaintiff's rights."). Mere legal conclusions and conclusory allegations simply reciting the elements of the claim are not entitled to the presumption of truth and must be rejected. *McCauley*, 671 F.3d at 616 (citing *Iqbal*, 556 U.S. at 680-81).

Finally, the Court also rejects Baskins' argument that a decision by final policymakers to intentionally omit policies necessary to solve a problem that leads to constitutional violations is sufficient to state a *Monell* claim. Pl.'s Resp. at 13. This is an accurate statement of law, but it does not fall under the final policymaker version of *Monell* liability. *See Daniel*, 833 F.3d at 735 (widespread policy theory of liability survived in part because a relevant policymaker knew of the systematic deficiencies and failed to take reasonable corrective action). As the Seventh Circuit held in *Vodak*, "[a] person who wants to impose liability on a municipality for a constitutional tort must show that the tort was committed (that is, authorized or directed) at the policymaking level of government." 639 F.3d at 747. A City is liable for the *affirmative* policies enacted by final policymakers under this version of *Monell* liability, not for a failure to enact a corrective policy. Each case cited by Baskins in support of this argument involves specific, affirmatively adopted policies. *King v. Kramer*, 680 F.3d 1013, 1021 (7th Cir. 2012) (policy limiting medication and doctor visits that resulted in an inmate's death); *Vodak*, 639 F.3d at 747-48 (policy enacted to control

demonstrations and mass arrests); *see also Steidl v. Gramley*, 151 F.3d 739, 741 (7th Cir. 1998) (holding warden—not a municipality—was not liable for the isolated failure of his subordinates to carry out a policy about manning guard towers). Baskins fails to state a claim that the City is liable for his injuries based on the action by a final policymaker.

## B. *Respondeat Superior* and Indemnification

The next issues up for review are the state law *respondeat superior* and indemnification claims. It is well established that the *respondeat superior* theory of liability is not applicable to Section 1983 claims. *Sanville v. McCaughtry*, 266 F.3d 724, 740 (7th Cir. 2001) ("The doctrine of *respondeat superior* does not apply to § 1983 actions; thus to be held individually liable, a defendant must be personally responsible for the deprivation of a constitutional right.") (cleaned up). So the Amended Complaint is limited to *respondeat superior* for the state law claims; the indemnification claim does seek coverage for any non-punitive-damages judgment against the officers. In Illinois, a plaintiff must prove that officers were acting within the scope of their employment in order to hold the City liable for their conduct. *Bagent v. Blessing Care Corp.*, 862 N.E.2d 985, 991 (Ill. 2007). An employee's conduct is within the scope of employment if: "(a) it is of the kind he is employed to perform; (b) it occurs substantially within the authorized time and space limits; [*and*] (c) it is actuated, at least in part, by a purpose to serve the master." *Id.* at 992. When an employee acts only to promote the employee's own personal interests, then the employee is not acting within the scope of employment. *Lyons v. Adams*, 257 F. Supp.

2d 1125, 1140 (N.D. Ill. 2003). It is the employee's subjective intent that matters under Illinois law. *Id.* (citing *Wright v. City of Danville*, 675 N.E.2d 110, 118 (Ill. 1996)). When facts relevant to whether the employee was acting within the scope of employment are in dispute, typically the issue should await resolution at trial, rather than the pleading stage. *See Doe v. City of Chi.*, 360 F.3d 667, 672 (7th Cir. 2004) (the court noted it has "warned repeatedly against trying to resolve indemnity before liability); *Doe v. Clavijo*, 72 F. Supp. 3d 910, 915 (N.D. Ill. 2014) (collecting cases and declining to resolve the issues of *respondeat superior* liability and indemnification at the motion to dismiss stage).

Baskins adequately alleges facts to plausibly state a claim that the Defendant Officers were acting within the scope of their employment. As noted above, Baskins alleges that the officers were on duty. Am. Compl. ¶¶ 27, 66. Contrary to the City's argument, Mot. Dismiss at 14, this is a factual allegation that must be accepted as true for purposes of deciding the motion to dismiss. *Iqbal*, 556 U.S. at 678. It is not fatal that Baskins failed to allege that he saw the officers' badges or service weapons; it is the *defendants'* subjective intent about whether they were acting to serve their employer that matters, not whether the plaintiff knows that the officers are on-duty police officers. To be sure, it is not necessarily dispositive that an officer was on duty: even if the officer is on duty, the officer's conduct will not be considered to be within the scope of employment if it is "too outrageous to be considered expectable." *Gambling v. Cornish*, 426 F. Supp. 1153 (N.D. Ill. 1977) (cleaned up); *see also Wolf v. Liberis*, 505 N.E.2d 1202, 1206 (Ill. App. 1987).

Baskins pleads that the officers have asserted that they were attempting to arrest Baskins because they believed Baskins possessed marijuana. Am. Compl. ¶¶ 36-37. The officers also contended that Baskins and his companions were the aggressors in the fight. *Id.* ¶ 38. As the City points out, Baskins alleges that these accusations are false and that the officers only made them to justify their own misconduct. Def.'s Reply at 12-13. The City argues that, under Baskins' version of events, it is clear that the officers' attack and the ensuing cover up served *only* the officers' interests. *Id.* At this stage in the case, however, the two versions of events alleged in the Amended Complaint are sufficient to create a factual dispute about whether the officers' conduct was the type that they were employed to perform (attempting to effectuate an arrest), or instead serve only their own interests. This is not the right time to resolve the factual disputes. *See Doe v. City of Chi*, 360 F.3d at 672 (courts rarely should determine indemnity before liability).

At least for now, the officers' on-duty status (again, that fact must be assumed to be true) supports that the altercation occurred substantially within the authorized time and geographic bounds of CPD officers. On-duty CPD officers in the City of Chicago are much more likely to be acting within the scope of their authority than an off-duty officer acting outside of the City. *See Anderson v. Moussa*, 250 F. Supp. 3d 344, 348-49 (N.D. Ill. 2017) (collecting cases and holding that off-duty officer who acted far outside his jurisdiction was not within the authorized space and time limits). Baskins also alleges that the officers met with attorneys in the City's Law Department both before and after the incident, and did so in their capacities as police

officers. Am. Compl. ¶¶ 23, 39-40. That is enough to plausibly plead that the officers were acting within the scope of employment. The *respondeat superior* claim survives.

It is worth discussing the City's argument that the officers' conduct could not be within the scope of their employment because they went to a bar where they drank alcohol after their first meeting with City Attorneys and before the incident with Baskins. Mot. Dismiss at 14-15 (citing Am. Compl. ¶¶ 21-26, 28-33, 39). The City relies on *Buchino v. Industrial Commission of Illinois*, 526 N.E.2d 425, 427 (Ill. App. 1988), where the court held that an employee of the City Department of Streets and Sanitation could not recover worker's compensation for an injury he sustained while traveling back to work from a bar where he had drank alcohol. The Illinois Appellate Court held that, even though the employee had been working before going to the bar, and was returning to work after the bar, his trip to the bar was a deviation from work that removed him from the course of employment. *Id.* at 428. But that case has little bearing on the facts at hand. The plaintiff in *Buchino* was on his own personal time when traveling to work before arriving, so he did not sustain his injury in the course of employment. *Id.* at 427. Here, there might very well be a version of the facts where a jury would find that the officers were acting within the scope of employment.

That answers the request to dismiss the indemnification claim as well. Under Illinois law, a municipality is only required to pay a judgment entered against the Defendant Officers if they acted within the scope of their employment. *See Wright*, 675 N.E.2d at 118. Because the *respondeat superior* claim survives for now, the indemnification count survives as well.

### C. Cross-Complaint

Kelly and Jarocki filed a Cross-Complaint against the City, alleging claims for *respondeat superior* and indemnification. Cross-Compl. at 9-14. The facts alleged in the Cross-Complaint are generally similar to the version of events that Baskins alleges the officers made up, with some additional details. In sum, the officers were ordered, as part of their official duties, to report to the City of Chicago's Law Department to meet about a pending federal case in this District. *Id.* ¶¶ 16, 22. The officers went to a nearby bar after the meeting, but returned to the Law Department's office after leaving the bar to make sure they were properly signed out. *Id.* ¶¶ 23-24. They then walked to a parking garage and were about to get out of the parking garage elevator when Baskins and his companions began entering it. *Id.* ¶¶ 25-26. Baskins and his companions were loud and aggressive towards the officers. *Id.* ¶ 26. After the officers left the elevator, Baskins and his companions followed them and shouted verbal insults and obscenities. *Id.* ¶ 27. Baskins hit Gilmore in the face with a closed fist, after which the two men fought and Gilmore fell on the ground. *Id.* ¶ 31. Baskins then got on top of Gilmore and continued to hit him with a closed fist. *Id.* Officer Kelly saw this, believed Gilmore was unconscious and being severely injured, and pursuant to CPD rules and regulations, directed Baskins to stop punching Gilmore. *Id.* ¶¶ 33-34. As Kelly attempted to perform an emergency takedown on Baskins, Baskins resisted and started hitting Kelly in the face. *Id.* ¶ 35. Then Baskins and his companions suddenly fled, after which Kelly and Jarocki looked after Gilmore, who was severely injured. *Id.* ¶ 36. Kelly and Jarocki later learned that Gilmore's service

firearm was missing and concluded that Baskins or one of his compassion had stolen it. *Id.* ¶ 38. Eventually, after calling 911 and searching for the missing gun, the officers returned to the City's Law Department. *Id.* ¶¶ 40, 42, 44. At all relevant times, the officers were dressed in plain clothes, had their service weapons, and had their CPD-issued star or badge clipped and displayed on their belts (although Jarocki's star or badge may have been in his pocket). Cross-Compl. ¶¶ 19-21. The officers allege that they were only witnesses in Baskins' criminal case and did not arrest, investigate, or prosecute him. *Id.* ¶ 46.

The City moves to dismiss the Cross-Complaint for failure to state a claim, arguing that, because the officers allege that they committed no misconduct in the Cross-Complaint, then there will definitely be no need for indemnification.[9] Mot. Dismiss Cross-Compl. at 4. But this argument is wrong and is not supported by the cases cited by the City. The City relies heavily on *Canadian Pac. Ry. Ltd. v. Leeco Steel, LLC*, 2015 WL 1840939 (N.D. Ill. Apr. 16, 2015). In *Leeco*, the underlying complaint alleged that two defendants owed the plaintiff money for demurrage charges imposed because of their misconduct; one defendant filed a cross-claim for

---

[9]The City also briefly contends that a *respondeat superior* claim is not a separate cause of action, but rather simply a basis for holding an entity responsible for its agents' misdeeds. R. 86, Def.'s Reply to Cross-Compl. at 1-2 (citing *Jones v. UPS Ground Freight, Inc.*, 2016 WL 826403, *3 (N.D. Ill. Mar. 3, 2016)). Although the court in *Jones* dismissed *respondeat superior* as an independent claim, it did so because the plaintiff did not respond to an argument about it, and allowed the plaintiff to pursue it as a theory of holding the employer liable for its employees' conduct. 2016 WL 826403, *3. Here, the Defendant Officers did not have the opportunity to address the argument since it was raised in the City's Reply in Support of its Motion to Dismiss the Cross-Complaint, and the City does not flesh out its argument. There is no benefit to dismissing these claims, they will require the same evidence about the Defendant Officers' scope of employment as the indemnification claims.

implied indemnity in which it alleged that its co-defendant's conduct made it responsible for the charges. *Id.* at *1-2. But the defendant seeking indemnity failed to sufficiently allege that the co-defendant was liable for the underlying misconduct, meaning that the crossclaim for indemnity could not stand on its own and both parties remained liable to the plaintiff for the underlying claim. *Id.* at *3. Even if the defendant seeking indemnity had adequately pled that the co-defendant was solely liable, the claim still would have been dependent upon a finding of liability in the underlying case against both defendants. Here, the City does not dispute that the Cross-Complaint sufficiently alleges that they were acting within the scope of their employment when they encountered Baskins. Baskins does not allege a separate tort claim against the City as was the case in *Leeco*; rather the City's proposed indemnification liability is premised solely on whether the officers were acting within the scope of their employment. *See Wright*, 675 N.E.2d at 118. So Kelly and Jarocki have adequately pled all they *could* to establish the indemnification obligation if they are found liable for the underlying misconduct. That the officers did not plead facts conceding their liability to Baskins does *not* equate to a failure to plead *respondeat superior* and indemnification against the City. An indemnification claim necessarily will be tied to an underlying claim for liability. *McGreal v. AT&T Corp.*, 892 F. Supp. 2d 996, 1017-18 (N.D. Ill. 2012) (dismissing plaintiff's *respondeat superior* and indemnification claims against the employer because plaintiff failed to state a claim against the employees, meaning there was "no wrongdoing to indemnify"). This Court

has not dismissed the underlying claims against the officers, so there might still be wrongdoing to indemnify.

The City argues next that the indemnification action is premature while the underlying action is pending. Mot. Dismiss Cross-Compl. at 4-5 (citing *Bd. of Trustees, Village of Bolingbrook Police Pension Fund v. Underwood, Neuhaus & Co. Inc.*, 742 F. Supp. 984, 989 (N.D. Ill. 1990). "Whether an indemnification issue is ripe for adjudication depends on the facts and circumstances of the case under consideration." *Village of Bolingbrook*, 742 F. Supp. at 989. In *Underwood*, the court dismissed the indemnification claim without prejudice, because determining whether the employer had a duty to indemnify its agent would require the court to determine "the ultimate fact of whether [the employee's] conduct was willful or wanton," which "would have an effect on the litigation." *Id.* at 989-90. Here, the Defendant Officers seek indemnification under a different statute, 745 ILCS 10/9-102, which does not require a finding of willfulness or wantonness either way. Instead, the City argues that resolving the officers' cross-claim "would require the Court to rule on the ultimate issue of whether there was wrongful conduct on October 30, 2014 that creates liability for the officers." Mot. Dismiss Cross-Claim at 5. But the Court need not decide that issue now. Indeed, Federal Rule of Civil Procedure 13(g) states that a crossclaim "may include a claim that the coparty is *or may be liable* to the crossclaimant for all or part of a claim asserted in the action against the crossclaimaint." (emphasis added). Allowing the Cross-Complaint to survive the dismissal motion would not require this Court to rule on any ultimate issues, since it

need not decide whether the officers engaged in any underlying misconduct; the City *may be* liable to the Defendant Officers if it is later determined that the officers engaged in misconduct. Put another way, this Court is not holding that the City *must* indemnify the officers; rather it is merely allowing the officers' indemnification claims to survive past the pleading stage. The City's motion to dismiss the Cross-Complaint is thus denied.

## IV. Conclusion

For the reasons discussed, the *Monell* claims survive, although not on every theory articulated. Discovery on *Monell* liability will be limited to the following: (1) the code of silence that encourages officers to remain quiet about officer misconduct and to fabricate evidence and initiate charges against civilians to cover up the misconduct, as well as the City's knowledge of and failure to address the code of silence; and (2) the failure to discipline officers who engage in misconduct (this likely should be a subject of conferral to confine discovery to what is reasonably necessary in this case). Discovery cannot proceed on the other versions of *Monell* liability.

The City's motion to dismiss the Cross-Complaint is also denied. Of course, when this case gets to the summary judgment stage or to trial, the City may attempt to establish that the officers were not acting within the scope of their employment. What's more, if the officers are found to be not liable, then of course the City also will not be liable under *respondeat superior* or indemnification.

On or before October 19, 2018, the parties shall file a status report proposing a discovery schedule for the *Monell* claim. The status hearing of October 26, 2018 remains in place.

ENTERED:

_____s/Edmond E. Chang_____
Honorable Edmond E. Chang
United States District Judge

DATE: September 30, 2018