IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | | |
|---|---|---|
| JOSEPH BASKINS, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 1:17-cv-07566 |
| | ) | |
| v. | ) | Hon. Edmond E. Chang |
| | ) | District Judge |
| PATRICK GILMORE, MICHAEL R. | ) | |
| KELLY, MARC JAROCKI, Unknown | ) | |
| Chicago Police Department Employees, | ) | |
| and the CITY OF CHICAGO, | ) | |
| | ) | |
| Defendants. | ) | JURY TRIAL DEMANDED |

## SECOND AMENDED COMPLAINT

NOW COMES Plaintiff, JOSEPH BASKINS, by and through his attorneys

LOEVY & LOEVY, and complaining of Defendants PATRICK GILMORE,

MICHAEL R. KELLY, MARC JAROCKI, Unknown Chicago Police Department

Employees, and the CITY OF CHICAGO, states as follows:

## INTRODUCTION

1.     On what should have been one of the happiest days of his life, Plaintiff

Joseph Baskins was instead subjected to a nightmare that would last three years.

2.     On October 30, 2014, Baskins, his fiancée, and two friends went to the

Chicago City Hall. They were there for Baskins to get married.

3.     At City Hall, Baskins had the misfortune of crossing paths with three

intoxicated and aggressive Chicago police officers who were on duty. Baskins, his

fiancée, and their friends shared an elevator with Officers Patrick Gilmore, Michael

Kelly, and Marc Jarocki.

4. The Defendant Officers proceeded to subject Baskins, his fiancée, and their wedding guests to verbal harassment, including racial abuse. They then attacked Baskins without provocation.

5. In the altercation that followed, one officer drew his firearm, and had it taken from him in the melee.

6. Baskins and his friends fled for their lives. Hours later, they found themselves under arrest notwithstanding the fact that they had broken no laws.

7. Baskins was thereafter subjected to three years of false criminal charges. It was not until July 2017 that the State dismissed these charges in a manner indicative of Baskin's innocence.

## JURISDICTION AND VENUE

8. This action is brought pursuant to 42 U.S.C. § 1983 and Illinois law to redress the Defendants' tortious conduct and their deprivation of Plaintiff's rights secured by the U.S. Constitution.

9. This Court has jurisdiction of the action pursuant to 28 U.S.C. §§ 1331 and 1367.

10. Venue is proper under 28 U.S.C. § 1391(b). Plaintiff resides in this judicial district; and the events giving rise to Plaintiff's claims asserted herein all occurred within this judicial district.

## PARTIES

11. Joseph E. Baskins is a 31-year-old man. He is currently a resident of the state of Illinois. At the time of the attack, he lived in Indiana with his fiancée.

12.     Mr. Baskins is currently employed in construction and as a plumber. He is the father of two children, and his partner is currently expecting.

13.     Defendant Patrick Gilmore was a Sergeant with the Chicago Police department employed by the City of Chicago. At all times relevant to the events described in this Complaint, Gilmore was acting under color of law and within the scope of his employment with the Chicago Police Department. He is no longer an active member of the CPD; he has taken disability.

14.     Defendant Michael R. Kelly is an officer with the Chicago Police Department employed by the City of Chicago. At all times relevant to the events described in this Complaint, Kelly was acting under color of law and within the scope of his employment with the Chicago Police Department. Kelly is currently suspended pending the outcome of an internal affairs investigation of his conduct in connection with Joseph Baskins.

15.     Defendant Marc Jarocki is or was an officer with the Chicago Police Department employed by the City of Chicago. At all times relevant to the events described in this Complaint, Jarocki was acting under color of law and within the scope of his employment with the Chicago Police Department. Jarocki is currently suspended pending the outcome of an internal affairs investigation of his conduct in connection with Joseph Baskins.

16.     Defendant(s) Unknown Chicago Police Department Employee(s) participated in the misconduct alleged in this complaint. At all times relevant to the events described in this Complaint, these Unknown Chicago Police Department

Employees were acting under color of law and within the scope of their employment with the Chicago Police Department.

17.     Defendant City of Chicago is an Illinois municipal corporation that is or was the employer of Defendant(s) Unidentified Chicago Police Department Employee(s). The City of Chicago is liable for all torts committed by the Unidentified Chicago Police Detective and Unidentified Chicago Police Officer Defendants while employed by the City of Chicago pursuant to the doctrine of respondeat superior. Defendant City of Chicago is additionally responsible for the policies and practices of the Chicago Police Department.

## FACTS

### *The Would-be Wedding of Joseph Baskins*

18.     Plaintiff Joseph Baskins and his fiancée planned to travel to the Chicago City Hall with friends to get married on October 30, 2014.

19.     They were joined by Baskins' cousin as well as his best friend, and his baby (hereinafter "Plaintiff's Wedding Party").

20.     When Plaintiff's Wedding Party arrived at City Hall, they learned the office they needed to go to was closed for lunch.

21.     They boarded the elevator to the parking garage. Three white men boarded the elevator with Plaintiff's Wedding Party.

22.     The men were later identified as CPD Officers Patrick Gilmore, Michael R. Kelly, and Marc Jarocki (hereinafter "Defendant Officers").

23.     The Defendant Officers were in the building to meet with attorneys

from the City of Chicago Law Department, Gail Reich and Kathryn Doi, regarding another civil rights lawsuit.

24.     On information and belief, Defendant Officers had also spent time in a bar consuming alcohol.

25.     On information and belief, a credit card receipt belonging to one of the Defendant Officers shows a charge at the "Cactus Bar" for eight beers and six vodkas the afternoon of October 30, 2014.

26.     Defendant Officers consumed at least this much alcohol.

27.     They were on duty at the time.

28.     After boarding the elevator, one of the Defendant Officers said words to Baskins to the effect of "you are on the wrong elevator," and referred to a "black nigger squad," and made other racist statements.

29.     Baskins asked the individual what he said, and another one of the Defendant Officers responded, "You heard what he said."

30.     Once the elevator arrived at the garage, a tall officer punched Baskins in the mouth without provocation.

31.     On information and belief, this individual was Defendant Patrick Gilmore.

32.     Baskins defended himself, and Defendant Gilmore and he began to fist fight before going to the ground and grappling.

33.     At some point during the encounter, Defendant Gilmore pulled a gun and pointed it at Baskins from behind.

34. Baskins next heard his friend scream words to the effect of, "It's a gun! It's a gun!" Baskins' friend then kicked the gun away from Defendant Gilmore.

35. Baskins looked down and saw the gun. Fearing for the lives of his family and friends if his assailants recovered the gun, he picked it up along with the baby and ran.

### The Defendant Officers' False Version of Events

36. Defendant Gilmore and the other Defendant Officers claimed to have smelled marijuana upon encountering Plaintiff's Wedding Party. In reality, no member of Plaintiff's Wedding Party possessed marijuana or smelled like marijuana.

37. The Defendant Officers have claimed that they were attempting to arrest Baskins based on their belief he possessed marijuana.

38. The Defendant Officers then claimed that Baskins and his group were the aggressors, and initiated criminal action against Baskins as a means of covering up their actions.

### The Aftermath

39. On information and belief, the Defendant Officers returned to meet with Reich and Doi immediately after their attack on Baskins.

40. On information and belief, either Reich or Doi offered the Defendant Officers gum to hide the smell of alcohol on their breath.

41. After getting away from his attackers, Baskins immediately placed the gun in his fiancée's car. She owned the car. Baskins' name was not on the

registration.

42.     Baskins and the remaining members of Plaintiff's Wedding Party took the CTA Red Line home. His fiancée drove her car with the baby separately. The gun remained in the glovebox of her car.

43.     While they were still traveling home, a friend of the family called Baskins to ask about the fight after seeing his picture on the news.

44.     Baskins arrived at the apartment first. His fiancée arrived between thirty and forty-five minutes after Baskins. When she arrived, she left the gun in her car.

45.     Baskins decided to call a lawyer. After several phone calls, he was unable to find affordable representation.

46.     Baskins then called his friend, Lee Long, who was an officer of the Dixmoor Police Department.

47.     Long told him to come to him the next day to surrender. In the meantime, long instructed Baskins to wrap the gun in a cloth and put it in a safe place.

48.     Throughout the several hours of discussion and phone calls, Baskins' fiancée's car was parked outside on the street with the gun in her glovebox.

49.     As soon as Baskins talked with Long, he went to wrap the gun in a sweater and two grocery bags. He placed it in the bushes outside of his home, away from him and out of sight of anyone else.

50.     Shortly thereafter, Lake County, Indiana Sheriff's deputies arrived,

screaming, "where's the gun," or words to that effect.

51.    Baskins immediately told them where the gun was.

52.    Baskins, his fiancée, and cousin were arrested without warrants by Lake County deputies, but Baskins' fiancée and cousin were released from the station.

### The Prosecution of Joseph Baskins

53.    Baskins was detained for two weeks in Lake County, Indiana with no bond on suspicion of aggravated robbery and aggravated assault on a police officer. He was never charged with either offense.

54.    Baskins was questioned by Lake County law enforcement during this time.

55.    Baskins was then transferred to Cook County. He spent the first two days being questioned at the 1st district station at 18th and State.

56.    He was then charged with unlawful possession of a firearm by a felon. Bond was set at $25,000.

57.    Three years of criminal proceedings followed.

58.    During that period of time, his relationship with his fiancée had ended and his current girlfriend was pregnant.

59.    On June 26, 2017, Baskins appeared in court to request a trial date. Trial was set for September 18, 2017.

60.    Shortly after, the State offered Baskins a plea agreement calling for him to spend one year in prison.

61.     Because he was innocent, Baskins rejected this offer.

62.     The following Thursday, July 6, the State dropped the charges against Baskins.

63.     The State did so because the State could not prove that Baskins committed any criminal acts.

64.     On information and belief, in the years following the attack, Defendant Gilmore has taken disability and left the CPD.

65.     On information and belief, Defendant Gilmore has claimed he suffered brain damage during the incident.

66.     On information and belief, he remembers acting in the course of his duty as a law enforcement official.

67.     On information and belief, Defendant Gilmore claims not to remember the details of his pre-attack activities, including his time drinking with the other Defendant Officers at the "Cactus Bar."

68.     On information and belief, Officer Jarocki is currently on administrative leave pending an investigation of his conduct in this matter.

69.     On information and belief, Officer Kelly is currently on administrative leave pending an investigation of his conduct in this matter.

70.     On information and belief, Attorneys Reich and Doi resigned their positions following a Chicago Inspector General investigation of their conduct related to this matter.

71.     As a result of Defendants' actions, Joseph Baskins lost his fiancée, his

home, and had years of his life ruined by the shadow of these false allegations.

*City of Chicago's Negligent Retention, Supervision and Training*

72.     At the time of this occurrence (in 2014), Defendant Gilmore had received a total of 40 citizen complaints; Defendant Jarocki had received a total of 31 citizen complaints; Defendant Kelly had received a total of 20 citizen complaints. All of the Defendants were alleged to have neglected their duties, used racial and ethnic profanities towards citizens, and engaged in the use of excessive force numerous times throughout their careers.

73.     Based on the City's own data, Defendant Gilmore was accused in more civilian complaints per year than 98% of other officers, since the year 2000. Defendant Gilmore was further accused in more use of force complaints than 95% of other officers, since the year 2004.

74.     By its own reporting procedures, Defendant City of Chicago was put on notice each and every time a citizen filed a complaint or civil lawsuit against the Individual Defendants, but failed to appropriately take steps to investigate the misconduct or provide additional targeted training and /or supervision following each alleged incident. In fact, Defendant Gilmore was promoted to a supervisory position despite his checkered background, and was the supervisor of Defendants Jarocki and Kelly at the time of the incident with Plaintiff.

75.     Due to the City's knowledge of the Defendant Officers' history of misconduct and lack of supervision or training following each instance of misconduct, it was foreseeable that their misconduct would continue unabated, as it

10

did when they initiated an unprovoked attack against Plaintiff.

76.     The City of Chicago violated its own standards in retaining, supervising or training Defendants Gilmore, Jarocki and Kelly.

## COUNT I – 42 U.S.C. § 1983
## Federal Malicious Prosecution

77.     Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

78.     In the manner described above, Defendants, acting as investigators, individually, jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, accused Plaintiff of criminal activity and exerted influence to initiate, continue, and perpetuate judicial proceedings against Plaintiff without any probable cause for doing so and in spite of the fact that they knew Plaintiff was innocent, in violation of his rights secured by the Fourth and Fourteenth Amendments of the United States Constitution.

79.     In doing so, these Defendants caused Plaintiff to be subjected improperly to judicial proceedings for which there was no probable cause. These judicial proceedings were instituted and continued maliciously, resulting in injury.

80.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and in total disregard of the truth and Plaintiff's clear innocence.

81.     As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and

11

damages as set forth above.

82.     Plaintiff's injuries were caused by employees of the City of Chicago, who acted pursuant to the policies and practices of the Chicago Police Department described in more detail below.

## COUNT II – 42 U.S.C. § 1983
### Conspiracy to Deprive Constitutional Rights

83.     Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

84.     After the attack on Baskins and his family, the Defendant Officers, acting in concert with other co-conspirators, known and unknown, reached an agreement among themselves to frame Plaintiff for a crime he did not commit and thereby to deprive him of his constitutional rights, all as described in the various paragraphs of this Complaint.

85.     In furtherance of their conspiracy, each of these co-conspirators committed overt acts and were otherwise willful participants in joint activity.

86.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and in total disregard of the truth and Plaintiff's clear innocence.

87.     Pursuant to the agreement described in this Count, Defendants did conceal, obscure, and destroy physical and documentary evidence relating to the attack on Baskins. This evidence concealed by Defendants includes, but is in no way limited to, the fact of Gilmore, Kelly and Jarocki's intoxication, and evidence of their unprovoked assault of Joseph Baskins. On information and belief, Defendants failed

12

to disclose security camera footage that would have proved Baskins' innocence.

88.　　The actions of Defendants described in this Count deprived Plaintiff of his constitutional rights, including, but not limited to, his right to due process.

89.　　As a result of Defendants misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

90.　　Plaintiff's injuries were caused by employees of the City of Chicago, who acted pursuant to the policies and practices of the Chicago Police Department described in more detail below.

### COUNT III – 42 U.S.C. § 1983
### Violation of Plaintiff's Due Process Rights

91.　　As described above, during the constitutional violations described herein, one or more of the Defendants stood by without intervening to prevent the violation of Plaintiff's constitutional rights, even though they had the duty and the opportunity to do so.

92.　　Further, Defendants withheld, suppressed and fabricated evidence, thereby misleading and misdirecting the criminal prosecution of Plaintiff.

93.　　The Defendant Officers' misconduct resulted directly in the prolonged and unjust criminal prosecution of Plaintiff, thereby denying his constitutional rights. Absent this misconduct, the prosecution of Plaintiff could not and would not have been pursued.

94.　　As a result of the Defendants' misconduct, and failure to intervene to

13

prevent the violation of Plaintiff's constitutional rights, Plaintiff suffered pain and injury, as well as emotional distress. These Defendants had ample, reasonable opportunities as well as the duty to prevent this harm, but failed to do so.

95.     The misconduct described in this Count was objectively unreasonable, and was undertaken and committed intentionally.

96.     As a result of Defendants misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

97.     Plaintiff's injuries were caused by employees of the City of Chicago, who acted pursuant to the policies and practices of the Chicago Police Department described in more detail below.

**COUNT IV– 42 U.S.C. § 1983**
**Policies and Practices of the City of Chicago [1]**

98.     The constitutional violations at issue in this case were caused by the official policies of the City of Chicago, which were implemented by its employees, including the named Defendants. The City of Chicago failed to promulgate express policies, allowed widespread practices and customs to persist, and took actions

---

[1] Plaintiff understands the Court's decision in Docket No. 94, but because the Court's dismissal of portions of Plaintiff's *Monell* theory is over Plaintiff's objection, *see* Dkt. 49, Plaintiff re-alleges all theories of his *Monell* claim in his Second Amended Complaint, in an abundance of caution, to preserve the issue for appeal. *See Johnson v. Myers*, 109 Fed. App'x 792 at *4 (2004) (explaining that the Seventh Circuit has not yet decided whether a party must "formalistically replead a dismissed claim in an amended complaint"). Plaintiff regrets that this action is necessary but his acknowledgement that the Court has already rejected portions of this claim obviates the need to re-brief motions to dismiss on the *Monell* claim.

through its final policymakers, which resulted in the violation of Plaintiff's rights at issue here.

99.     In particular, the City of Chicago failed to promulgate proper or adequate rules, regulations, policies, and procedures regarding: (a) use of force against citizens by the Chicago Police Department; (b) the arrest and charging of citizens by the Chicago Police Department, including the disclosure of evidence in criminal proceedings; and (c) the training, supervision, and discipline of Chicago Police Officers.

100.    These failures to promulgate proper or adequate rules, regulations, policies, and procedures were committed by policymaking officials for the City of Chicago and the Chicago Police Department.

101.    These failures to promulgate proper or adequate rules, regulations, policies, and procedures caused routine violations of the constitutional rights of citizens of the City of Chicago, including Plaintiff's constitutional rights.

102.    In addition, at all times relevant to the events described in this Complaint and for a period of time prior thereto, the City of Chicago had notice of widespread practices and customs of Chicago Police Officers under which: (a) unjustified and excessive force was used against citizens by members of the Chicago Police Department; (b) citizens were arrested for, charged with, and prosecuted for crimes by members of the Chicago Police Department without probable cause, based on false evidence, and without being provided exculpatory evidence in the possession of the Chicago Police Department.

103. Specifically, Chicago Police Officers routinely: (a) used deadly and non-deadly force against citizens, engaged in beatings of citizens, deployed firearms and other weapons against citizens, and otherwise effected seizures without any justification for doing so and without any threat to the officers using force or to others; and (b) arrested, charged, and caused citizens to be prosecuted, while knowing that there was no probable cause to suspect citizens of the offenses in question, by inventing false evidence to inculpate innocent individuals, by making false police reports that falsely reported the circumstances of a crime or investigation, by suppressing evidence relating to the offense, including witness statements, and by providing false statements to other law enforcement, prosecuting, and judicial authorities.

104. Policymaking officials had notice of these widespread practices and customs of the City of Chicago and failed to take action in response.

105. These widespread practices and customs of the City of Chicago resulted in routine violations of the constitutional rights of citizens of the City of Chicago, including Plaintiff's constitutional rights.

106. Evidence of the City of Chicago's widespread practice and custom of using excessive force against citizens without justification, and the City of Chicago's notice of that practice, is voluminous in the timeframe relevant to the events at issue in this case. Among other things:

     a. In January 2017, the Department of Justice released an extensive report into Chicago Police Department's routine violations of civil

16

rights. On the subject of excessive force, the report stated: "Although a specific number of incidents and statistical evidence is not required, our investigation found that CPD officers use unnecessary and unreasonable force in violation of the Constitution with frequency and that unconstitutional force has been historically tolerated by CPD. This finding is based on a comprehensive investigation of CPD's force practices." Department of Justice, *Investigation of the Chicago Police Department*, p. 23 (Jan 13, 2017).

b. The report identified dozens of examples of the Chicago Police Department's use of excessive force.

   i. "In one case, a man had been walking down a residential street with a friend when officers drove up, shined a light on him, and ordered him to freeze, because he had been fidgeting with his waistband. The man ran. Three officers gave chase and began shooting as they ran. In total, the officers fired 45 rounds, including 28 rifle rounds, toward the man. Several rounds struck the man, killing him. The officers claimed the man fired at them during the pursuit. Officers found no gun on the man." *Id.* at 25.

   ii. "In another case, a CPD officer chased and shot a man. The officer later claimed that during pursuit she ordered the man to stop, at which point the man turned and raised his right arm

17

towards her. According to the officer, the man had pointed a gun at her earlier in the incident and, fearing he was doing so now, she fired. The only gunshot wounds were to the man's buttocks. No weapon was found on the man, but a gun was found on a nearby roof gutter. IPRA found the shooting justified without accounting for the wounds to the man's backside." *Id.*

iii. "In another case, a CPD officer chased a man who ran when an officer told him to stop, and then shot the man in the back of the leg. The officer claimed the man had turned to point a gun. After a thorough search of the scene, no gun was recovered. The man, who denied ever turning to face the officer, was found only with a cell phone." *Id.*

iv. "In another case, a CPD officer fatally shot a fleeing, unarmed suspect in the back. The officer told investigators the suspect had turned around to point a black object. This account did not square with the location of the shooting victim's gunshot wounds and appeared contrary to video footage that showed the suspect running away from the officer. Again, IPRA accepted the officer's account, despite the conflicting evidence. IPRA's final report of the incident did not mention the existence of the video." *Id.*

v. "In another case, video evidence showed the tragic end of a foot pursuit of a man who was not a threat when an officer shot him in the back. The officer, who fired 16 shots, killing the man, claimed on his force report that the man was armed and the man 'charged [him] with apparent firearm.' The officer shot the man during the foot pursuit, and dashboard-camera footage showed that as the unarmed man lay on the ground, the officer fired three shots into his back. CPD stripped the officer of his police powers after this shooting—his third that year—and the City paid the man's family $4.1 million in settlement." *Id.*

vi. "In another case, an off-duty CPD officer spotted the silhouette of a man in a vacant building and suspected the man was burglarizing it. The officer called 911, but did not wait for other officers to arrive. Instead, the off-duty officer summoned the man out of the building. According to a civilian witness, the burglary suspect angrily exited the building, yelling, 'You're not a fucking cop.' The suspect then advanced on the officer, who struck and kicked the suspect. According to the officer, the suspect then reached into his waistband and withdrew a shiny object, prompting the officer to fire twice, killing the man. No weapon was recovered. Instead, officers reported finding a silver watch near the man's body. IPRA found the shooting justified

without addressing the officer's failure to await backup. According to press reports, in November 2016, this same officer shot a man in the back and killed him, claiming the man had pointed a gun at him during a foot pursuit. No gun was recovered." *Id.* at 28.

vii. "Officers used a Taser in 'drive-stun mode' against a woman in mental health crisis and whose only documented actions were that she failed to follow verbal commands and that she stiffened. Officers provided no narrative of the encounter other than to write that the woman was 'a high risk mental' who needed to be transported to a hospital for a 'mental evaluation.' They noted on the form that the woman was engaged in passive, not active, resistance." *Id.* at 32.

viii. "In an incident we reviewed, a man died after hitting his head when he fell while fleeing because a CPD officer shot him with a Taser. The man had been suspected only of petty theft from a retail store. IPRA deemed this use of a Taser justified." *Id.*

ix. "In one incident, officers hit a 16-year-old girl with a baton and then Tasered her after she was asked to leave the school for having a cell phone in violation of school rules. Officers were called in to arrest her for trespassing. Officers claimed the force was justified because she flailed her arms when they tried to

arrest her, with no adequate explanation for how such flailing met the criteria for use of a Taser. This was not an isolated incident. We also reviewed incidents in which officer's unnecessarily drive-stunned students to break up fights, including one use of a Taser in drive-stun mode against a 14-year-old girl. There was no indication in these files that these students' conduct warranted use of the Taser instead of a less serious application of force." *Id.*

x. "In one incident, an officer's neighbor called to report that some boys were playing basketball on the officer's property. The officer, on duty, left his district to respond and found the teenage boys down the street on their bikes. The officer pointed his gun at them, used profanity, and threatened to put their heads through a wall and to blow up their homes. The boys claim that the officer forced them to kneel and lay face-down, handcuffed together, leaving visible injuries on their knees and wrists. Once released, one boy called his mother crying to tell her an officer had pointed a gun at his face; another boy went home and showed his mother his scraped leg and, visibly upset, said 'the police did this to me.' The mothers reported the incident to IPRA. The officer, who had not reported the use of force, accepted a finding of 'sustained' and received a five-day

suspension. The officer was never interviewed and his reasons for not contesting the allegations are not documented in the file." *Id.* at 33-34.

xi. "In another case, an officer forcibly handcuffed a 12-year-old Latino boy who was outside riding a bike under his father's supervision. A plainclothes officer, responding to a report of 'two male Hispanics running from' the area, detained the boy. According to the boy and his father, the officer approached the boy, ordered him to stop his bike, forcibly handcuffed him, pulled him off his bike, and placed him up against a fence. The boy reported he did not understand the man was a police officer or why he was being detained and told the officer he was only 12." *Id.*

xii. "In one incident captured on cell-phone video, an officer breaking up a party approached a man, grabbed him by the shirt, and hit him in the head with a baton. In his reports, the officer, using language very similar to that used in many other reports we reviewed, falsely claimed that the victim had tried to punch him. Before the video surfaced, the officer's supervisor had approved the use of force and the victim had pled guilty to resisting arrest. The officer has since been relieved of his police powers and is facing criminal charges for his conduct." *Id.* at 35.

xiii. "In another video, a woman exited her car and placed her hands on her vehicle when officers threw her to the ground, hit her, and deployed a Taser against her. The video indicates that the officer's claim that she had refused to show her hands, thus justifying the force used, was false. Despite the existence of the video, IPRA deemed the force reasonable." *Id.*

xiv. "In one incident, for example, officers justified unreasonable force by falsely claiming in their reports that a woman had attacked them. In the video, officers can be seen aggressively grabbing the woman, who was being arrested for a prostitution offense, throwing her to the ground, and surrounding her. After she is handcuffed, one officer tells another to 'taser her ten fucking times.' Officers call her an animal, threaten to kill her and her family, and scream, 'I'll put you in a UPS box and send you back to wherever the fuck you came from' while hitting the woman—who was handcuffed and on her knees. Officers can then be seen discovering a recording device and discussing whether they can take it. Supervisors approved this use of force and the officers were not disciplined until after the woman complained to IPRA and produced surveillance video of the event. The City paid the woman $150,000 in settlement of her lawsuit." *Id.*

c.  Between 2010 and 2016, CPD officers were involved in at least 203 shootings of citizens.

d.  During that same time, The DOJ report estimated at least 425 complaints of non-lethal force against Chicago Police Department Officers.

e.  In addition to the above noted examples, there are substantial instances of excessive force that have led to jury verdicts or settlements against the city.

    i.  In 2007, Aaron Harrison was shot and killed by Chicago Police officers when he ran from a squad car as it pulled up near him. *Harrison v. City of* Chicago, No. 07 CV 8493. (N.D. Ill.) The City of Chicago settled the case for $8,506,616.

    ii. In 2011, Chicago Police Officer Stevan Vidljinovic deployed a Taser against Jose Lopez. Lopez had been receiving medical treatment when officers arrived. After being hit with the Taser, Lopez hit fell to the ground and suffered significant and lasting injuries.  In 2017, a federal jury concluded Vidljinovic used excessive force. The City of Chicago later agreed to a $9,500,000 settlement. *Lopez v. City of Chicago*, No. 12 CV 5751. (N.D. Ill.).

    iii. In 2013, Officer Marco Pronao fired 16 shots into a car full of teenagers, injuring two. The Chicago Police Department determined at the time the shooting was justified. In August of

2017, Officer Pronao was convicted by a federal criminal jury of several civil rights abuses and excessive force. *United States of America v. Marco Pronao*, 16 CR 00590. (N.D. Ill.) On information and belief, the city is in the process of terminating Pronao.

iv. In 2014, Levail Smith, a disabled combat veteran, was approached by police for holding a beer on the street. In fear, Smith fled and was chased by several officers. A Chicago Police officer shot Smith several times. The City of Chicago agreed to settle the case for $450,000. *Smith v. City of Chicago*, No. 15 CV 5898. (N.D. Ill.).

v. In 2014, Chicago Police Officer Jason Van Dyke shot Laquan McDonald 16 times as McDonald walked away. Van Dyke was initially cleared of wrong-doing by Chicago Police Department. In April of 2015, The City of Chicago agreed to a $5,000,000 settlement with the McDonald family before a lawsuit could be filed. Subsequently, Van Dyke has been charged with murder, and three officers have been charged with conspiring to obstruct justice and cover up any related misconduct.

vi. In December 2017, COPA recommended the termination of a Chicago Police Department officer for the unjustified use of force against Quintonio LeGrier and Bettie Jones in 2015. Officers

responding to a mental health call shot LeGrier several times, killing Jones as well. Officers later misrepresented the circumstances of the shooting. Chicago Police Department had previously closed the investigation without seeking criminal charges.

f. In the past decade, the City of Chicago has approved hundreds of millions of dollars in settlements in cases based on the Chicago Police Department's unjustified uses of excessive force.

107. Evidence of the City of Chicago's widespread practice and custom of subjecting citizens to arrest, charges, and prosecution without probable cause, based on false evidence, and without disclosure of exculpatory evidence is similarly widespread. Among other things:

a. Starting in the 1980s, the Chicago Reporter found that tens of thousands of citizens were arrested in Chicago neighborhoods in cases that almost never resulted in a conviction because Chicago Police Officers would not show up in court to defend the arrest. The American Civil Liberties Union challenged this pattern and practice of illegal arrests in the lawsuit *Michael Nelson v. City of Chicago*, 83 C 1168 (N.D. Ill.).

b. In the 1990s, the pattern of illegal seizures continued with the City's so-called "gang loitering ordinance," under which thousands of citizens were arrested without justification. The Supreme Court later declared

the practice unconstitutional in *City of Chicago v. Morales*, 527 U.S. 41 (1999).

c. In the 2000s, illegal seizures by the Chicago Police Department remained common. In 2003, the American Civil Liberties Union again filed suit, this time on behalf of Olympic Gold medalist Shani Davis and others, alleging illegal seizures by Chicago Police officers. *Davis v. City of Chicago*, 219 F.R.D. 593 (N.D. Ill. 2004) (No. 03 C 2094), 2003 WL 23800673.

d. In April 2016, the Chicago Police Accountability Task Force confirmed that searches and seizures of African-Americans like Plaintiff occurred at much higher rates than searches and seizures of the rest of the population.

e. In the past decade, the City has litigated and lost dozens of civil rights lawsuits contending that arrests, prosecutions, and convictions were secured without probable cause, based on false evidence, and/or because material exculpatory evidence was suppressed, including:

  i. In 2006, the city of Chicago agreed to a $2,000,000 settlement with Eric Kittler. *Kittler v. City of Chicago*, No. 03 CV 06992 (N.D. Ill.). Kittler was wrongfully convicted of murder and spent five years in prison before being acquitted after retrial. His conviction was obtained when Chicago Police Officers forced a

false confession from him, and concealed and altered records to cover up his actual innocence.

ii. In 2007, the City of Chicago agreed to a $20,000,000 settlement with Madison Hobley, Aaron Patterson, Leroy Orange and Stanley Howard based on their wrongful convictions. The four men were all wrongfully convicted after being tortured by John Burge. They were pardoned in 2003.

iii. Also in 2007, a federal jury awarded Timothy Finwall $2,000,000 against the City of Chicago for his wrongful arrest. *Finwall v. City of Chicago*, No. 04 CV 4663 (N.D. Ill.). Finwall was wrongfully arrested for attempted kidnapping, after officers misreported the results of a lineup to falsely reflect the victim picked Finwall.

iv. In 2009, a federal jury awarded $21,000,000 in damages to Juan Johnson against the City of Chicago. *Johnson v. City of Chicago*, No. 05 CV 1042 (N.D. Ill.). Johnson was wrongfully convicted of murder, and spent 15 years in prison as the result of fabricated evidence.

v. In 2013, the City of Chicago agreed to a $10,250,000 settlement with Alton Logan, *Logan v. City of Chicago*, No. 09 CV 5471 (N.D. Ill.). Logan had been wrongfully convicted of a 1982 murder, a crime he did not commit. His conviction was obtained

when Chicago Police Officers including John Burge concealed and withheld exculpatory evidence.

vi. Also in 2013, Eric Caine reached a $10,000,000 settlement with the City of Chicago. *Caine v. City of Chicago*, No. 11 CV 08996 (N.D. Ill.). Caine was wrongfully convicted of double murder after officers working for Jon Burge tortured him into a false confession.

vii. In 2017, the City of Chicago approved a $30,999,000 settlement with Michael Saunders, Vincent Thames, Harold Richardson and Terrill Swift, the so called "Englewood 4." Each man spent around 15 years in prison for a rape and murder they did not commit. They were convicted based on coerced confessions, and only freed when DNA evidence established the identity of the actual killer.

viii. In December 2016, a jury in *Fields v. City of Chicago*, No. 10 C 1168 (N.D. Ill.), found that the Chicago Police Department maintained a policy and practice of suppressing material exculpatory evidence in secret files for decades, awarding Fields who was wrongly convicted as a result of the policy more than $21,000,000.

ix. In 2017, a federal jury awarded Deon Patrick more than $13,000,000 for the 25 years he spent in prison after being

wrongfully convicted of murder. *Patrick v. City of Chicago*, No. 14 CV 3658 (N.D. Ill.). Patrick was tortured, coerced into confessing, and faced a case built on evidence fabricated by police.

f.   These examples demonstrate that the Chicago Police Department's pattern and practice of falsely arresting, prosecuting, and convicting citizens, and particularly African-American citizens, is longstanding and widespread.

g.   Many of these illegal arrests, prosecutions, and convictions have resulted in settlements approved by the City of Chicago. Between 2008 and 2016, for example, the City paid judgments and settlements in a minimum of 700 false arrest cases, paying tens of millions of dollars to citizens whose constitutional rights had been violated by Chicago Police officers.

108.   In addition to the widespread practices discussed above, the violations of Plaintiff's constitutional rights were also caused by the City's failure to adequately train, supervise, and discipline its officers. At all relevant times and for a period of time prior thereto: (a) Chicago Police Officers were permitted to use force without proper training, supervision, or discipline by supervisors in the Chicago Police Department who had knowledge of what constituted permissible and impermissible uses of force; (b) Chicago Police Officers were permitted to arrest, charge, and prosecute citizens without proper training, supervision, or

30

discipline by supervisors in the Chicago Police Department with knowledge of what constituted permissible basis for criminal charges and how evidence should be collected, maintained, and transmitted to the criminal justice system, among other subjects; and (c) employees of the Chicago Police Department formally and informally adhered to a "code of silence," whereby Chicago Police Officers, their supervisors, and other employees of the City of Chicago agreed explicitly and implicitly not to report misconduct committed by employees of the Chicago Police Department, creating an environment of lawlessness, without discipline, where employees of the Chicago Police Department engaged in misconduct without fear of reprisal.

109.  The widespread practices and customs of the City of Chicago described above are themselves evidence of the City's failure to train, supervise, and discipline Chicago Police Officers.

110.  In addition, in March 2015, the American Civil Liberties Union found that Chicago Police officers were hardly ever trained to conduct seizures after their initial training at the police academy. The American Civil Liberties Union also found that there was no evidence that Chicago Police seizures were being supervised by responsible Chicago Police supervisors.

111.  The U.S. Department of Justice's recent report likewise found that there were "engrained deficiencies in the systems CPD uses to provide officers with supervision and training." In particular, on the subject of training, the DOJ concluded that the "CPD's inattention to training needs, including a longstanding

31

failure to invest in the resources, facilities, staffing, and planning required to train a department of approximately 12,000 members, leaves officers underprepared to police effectively and lawfully. Officer errors and misconceptions that result from lack of training are not corrected in the field, because CPD has neither structured supervision in a way that will adequately support officers, nor invested in programs and systems that will detect when officers are in need of help or exhibiting behavior that must be corrected. Officers' ability to stay safe, protect public safety, and police within constitutional standards suffers as a result." DOJ Report, at 93-94.

112.   On the subject of supervision, the DOJ concluded among other things that "[I]instead of encouraging the chain of command to instill proper policing tactics and respect for constitutional policing in CPD officers, CPD provides little incentive, or even opportunity, for supervisors to meaningfully guide and direct CPD officers. CPD provides even less incentive for supervisors to hold officers accountable when they deviate from CPD policy and the law. The City has long known that CPD's direct supervision of officers is inadequate, including through the fact that multiple reports in the last two decades have highlighted deficiencies in CPD's supervisory practices. Yet, City and CPD leadership have not made the necessary reforms to CPD's supervision structure and processes, and community and officer safety suffers as a result." DOJ Report, at 105.

113. The failure of police supervision and discipline in the City of Chicago during the relevant time period, and the persistence of a code of silence, has been admitted by City policymakers and by Chicago Police Officers:

    a. The Mayor of the City of Chicago has acknowledged that a "code of silence" exists within the Chicago Police Department.

    b. In December 2016, the President of the police officers' union in Chicago admitted that there is a "code of silence" in the Chicago Police Department.

    c. In 2017, the U.S. Department of Justice found that current officers of the CPD and former high-level officials of the CPD acknowledged a "code of silence."

114. In addition, federal juries have found that the Chicago Police Department maintains a code of silence and fails to supervise and discipline its employees. Each of the following illustrative cases resulted a significant judgment that put the City of Chicago on notice of its failure to supervise and discipline officers:

    a. In the case of *Klipfel v. Bentsen*, No. 94 C 6415 (N.D. Ill.), a federal jury found that as of 1994 the Chicago Police Department maintained a code of silence that facilitated misconduct committed by officer Miedzianowski, who is now serving a life sentence in federal prison.

    b. In the case of *Obrycka v. City of Chicago et al.*, No. 07 C 2372 (N.D. Ill.), a federal jury found that as of February 2007, "The City [of

Chicago] had a widespread custom and/or practice of failing to investigate and/or discipline its officers and/or code of silence."

c.  In 2017, a federal jury in *Laporta v. Chicago*, No. 14 C 9665 (N.D. Ill.), found the City of Chicago maintained a policy of failing to supervise and discipline officers, awarding $44,700,000 in damages against the City of Chicago based in part on the widespread failure to discipline officers. Defendant Officer Patrick Kelly used his service weapon to shoot a friend in the head. Kelly was named in dozens of complaints, and had multiple arrests and a record of alcohol-based misconduct. Additionally, he had been named as a civil defendant six times. Kelly was not charged by prosecutors for the shooting.

d.  Also in 2017, the City of Chicago agreed to a $20,000,000 settlement in a lawsuit alleging the City's *de facto* policy of a code of silence enabled officer Joseph Frugoli. *Manzera v. Frugoli*, No. 13 CV 05626 (N.D. Ill.). Frugoli killed a person while he was driving drunk. The Chicago Police Department hid evidence of Officer Frugoli's part in the death, as well as his past record of alcohol based misconduct.

e.  The same constitutionally defective oversight system in place during the time periods at issue in the *Klipfel* case and in the *Obrycka* case were in place between 2014 and 2017, when Plaintiff suffered the abuse described above.

115.    The City of Chicago has long been aware that its supervision and discipline of police officers is inadequate. Nonetheless, it has taken no action to ensure that police officers who commit misconduct are disciplined.

116.    The U.S. Department of Justice has found, "Chicago seldom holds officers accountable for misconduct." DOJ Report, at 46.

117.    In the last seven years, when a citizen makes a complaint against a Chicago Police Officer, the Chicago Police Department sides with the officer and against the complainant 98% of the time. This one-sidedness extends to officers who fabricate or manipulate evidence in violation of Chicago Police Department Rule 14. In its report, the U.S. Department of Justice concluded: "[O]ur investigation found that IPRA and BIA treat such efforts to hide evidence as ancillary and unexceptional misconduct, and often do not investigate it, causing officers to believe there is not much to lose if they lie to cover up misconduct. Investigators employ a higher standard to sustain claims against officers for making false statements under what is known as a Rule 14 charge and they rarely expand their investigations to charge accused and witness officers with lying to cover up misconduct. Nor, until recently, has the City focused much attention on officers' efforts to conceal by mishandling video and audio equipment or by retaliating against civilians who witness misconduct." DOJ report, at 8.

118.    Even where a citizen complaint is sustained against an officer and upheld by the police board, there is a significant chance the officer will never face discipline. A recent investigative report showed that since 2010, when an officer

challenged discipline by grievance, their discipline was reduced or reversed altogether 85% of the time. These reductions have included the expunging of rule 14 violations.

119.    Serious abuses by Chicago Police Officers go entirely undisciplined by supervisors in the Chicago Police Department and policymakers in the City of Chicago. For example, in 2001, Chicago Police Officer Joseph Miedzianowski was convicted of several corruption charges. The Chicago Police Department ignored dozens of complaints against him. In 2011, Chicago Police Officer Jerome Finnigan was convicted of myriad corruption and misconduct charges. He, too, was not timely disciplined by the City of Chicago. In 2013, Chicago Police Sergeant Ronald Watts pleaded guilty to several federal corruption charges. The after effects of Watts's crimes are still being felt. In November 2017, fifteen people had their convictions vacated in Cook County as a result of Watts's misconduct. Watts also was not meaningfully disciplined by the City of Chicago. For decades, Chicago Police Officers Jon Burge and Reynaldo Guevara secured the wrongful conviction of numerous African-American and Latino men through the use of torture, physical violence, and other extreme investigative misconduct. Their misconduct alone has led to millions of dollars of liability for the City of Chicago. Burge was convicted of federal crimes. These officers, too, were never timely or meaningfully disciplined by the City of Chicago.

120.    Defendant Sergeant Gilmore has been the subject of at least 14 complaints, including CR #1042663, in which he was alleged to have lost control of

an arrestee and failed to notify anyone that the arrestee had escaped. Defendant Gilmore was further alleged to have used excessive force, threatening language and racial slurs prior to the arrestee escaping. In addition, Gilmore has been named as a defendant in at least three misconduct cases settled by the City of Chicago—two of them for excessive force. On information and belief, Defendant Gilmore has never been disciplined.

121. Defendant Jarocki has been the subject of several complaints, including #1067963, which alleged Jarocki used excessive force. The victim fled after being questioned; Jarocki hit him with his vehicle and then slammed his head against the ground. In addition, Jarocki has been named as a defendant in at least two misconduct cases settled by the City of Chicago—one of them for excessive force. On information and belief, Defendant Jarocki has never been disciplined.

122. In addition, Defendants Gilmore, Jarocki, and Kelly were the three defendants in a civil rights lawsuit, *Haddnot v. Kelly*, No. 00 C 6754 (N.D. Ill.). The complaint alleged that the three violated the Plaintiff's constitutional rights. The City of Chicago settled that case for $200,000.

123. On information and belief, Defendant Kelly has never been disciplined.

124. The City of Chicago has never implemented substantive measures to address the obvious deficiencies in its training, supervision, and discipline of Chicago Police Officers.

125. Between 2004 and 2016, the City paid more than $500 million to settle or pay judgements in police misconduct cases, without even conducting disciplinary

investigations in more than half of the cases, and while recommending discipline in fewer than 4% of those cases.

126.    The U.S. Department of Justice "confirmed that CPD's accountability systems are broadly ineffective at deterring or detecting misconduct, and at holding officers accountable when they violate the law or CPD policy." In particular, the Department of Justice found that the City failed to investigate nearly half of misconduct complaints; where investigations did occur, there were "consistent patterns of egregious investigative deficiencies"; and where misconduct complaints are sustained, discipline was inconsistent and unpredictable. DOJ Report, at 46.

127.    Similarly, the Chicago Police Accountability Task Force reported in April 2016 that "[g]oing back years, and continuing to the present day, CPD has missed opportunities to make accountability an organizational priority."

128.    Between 2011 and 2015, nearly half of complaints filed against police officers were not even investigated.

129.    All of the above widespread practices and customs, individually and/or together, were allowed to flourish because the leaders, supervisors, and policymakers of the City of Chicago directly encouraged, allowed, acquiesced in, and/or turned a blind eye to the very type of misconduct discussed above, by failing to adequately train, supervise, and control Chicago Police Officers, by failing to promulgate policies, and by failing to adequately punish and discipline prior instances of similar misconduct, thus directly encouraging future abuses, such as those affecting Plaintiff.

130. The above-described widespread practices, so well-settled as to constitute *de facto* policy within the Chicago Police Department, were able to exist and thrive because policymakers, acting under color of law with authority over the same, exhibited deliberate indifference to the problem, thereby effectively ratifying it.

131. Finally, based upon information and belief, individuals with final policymaking authority for the City of Chicago were directly and indirectly involved in the violation of Plaintiff's rights.

132. In particular, attorneys with the City of Chicago's Officer of the Corporation Counsel, who are delegated the responsibility for providing legal advice to Chicago Police Officers by the City of Chicago, among other things, were aware of the circumstances of the misconduct described in this Complaint, including but not limited to Defendants' intoxication and their unjustified use of force against Plaintiff, but they acted to suppress that misconduct and in so doing ensured that false criminal charges would be filed against Plaintiff.

133. After the attack, the Officer Defendants returned to the offices of these attorneys and, based upon information and belief, these attorneys offered the intoxicated officers gum in order to cover the smell of alcohol. The incident was not reported until a full hour had elapsed, during which time the Officer Defendants remained in the offices of the Corporation Counsel.

134. For years, these policymaking officials for the City of Chicago stood shoulder to shoulder with the Defendant Officers, helped to maintain the code of

silence, and participated in the suppression of material evidence, despite the ongoing violations of Plaintiff's rights.

135.    This misconduct was revealed in an investigation by the Office of the Inspector General, and two attorneys resigned as a result.

136.    The violations of Plaintiff's rights continued even as this investigation was taking place.

137.    All of the misconduct described in this Complaint was undertaken pursuant to the official policies of the City of Chicago described in this Count.

## COUNT V – State Law Claim
## Malicious Prosecution

138.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

139.    In the manner described above, the Defendant Officers acting as investigators, individually, jointly, or in conspiracy with one another, as well as within the scope of their employment, accused Plaintiff of criminal activity and exerted influence to initiate and to continue and perpetuate judicial proceedings against Plaintiff without any probable cause for doing so and in spite of the fact that they knew Plaintiff was innocent.

140.    In so doing, these Defendants caused Plaintiff to be subjected improperly to judicial proceedings for which there was no probable cause. These judicial proceedings were instituted and continued maliciously, resulting in injury.

141.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the

40

rights of others, and in total disregard of the truth and Plaintiff's clear innocence.

142.   As a result of the Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

## COUNT VI – State Law Claim
## Intentional Infliction of Emotional Distress

143.   Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

144.   The actions, omissions, and conduct of the Defendant Officers as set forth above were extreme and outrageous. These actions were rooted in an abuse of power and authority and were undertaken with the intent to cause, or were in reckless disregard to the probability that their conduct would cause severe emotional distress to Plaintiff, as is more fully alleged above.

145.   As a direct and proximate result of the Defendant Officers' actions, Plaintiff suffered and continues to suffer emotional distress and other grievous and continuing injuries and damages as set forth above.

## COUNT VII – State Law Claim
## Civil Conspiracy

146.   Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

147.   As described more fully in the preceding paragraphs, the Defendant Officers, acting in concert with other co-conspirators, known and unknown, reached

an agreement among themselves to frame Plaintiff for a crime he did not commit and conspired by concerted action to accomplish an unlawful purpose by an unlawful means. In addition, these co-conspirators agreed among themselves to protect one another from liability for depriving Plaintiff of these rights.

148.    In furtherance of their conspiracy, each of these co-conspirators committed overt acts and were otherwise willful participants in joint activity.

149.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and in total disregard of the truth and Plaintiff's clear innocence.

150.    As a result of the Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

## COUNT VIII – State Law Claim
### City of Chicago's Breach of Duty in Retention, Supervision and Training – Negligence

151.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

152.    The Defendant City of Chicago and its police department at all times relevant had a duty to exercise due care in retaining, supervising and training its police officers, including the Individual Defendants, in relation to their duties, including the use of excessive force and other instances of misconduct investigated by the Department.

153.    The Defendant City of Chicago and its police department breached those duties by failing to exercise due care in retaining, supervising and training officers who were involved, often repeatedly involved, in the use of excessive force and other instances of misconduct investigated by the Department.

154.    As a direct and proximate result of the City of Chicago's failure to exercise due care in retaining, supervising and training its officers, the Individual Defendants violated Plaintiff's constitutional rights, as described in detail throughout this Complaint.

### COUNT IX – State Law Claim
### City of Chicago's Breach of Duty in Retention, Supervision and Training – Willful and Wanton Conduct

155.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

156.    The City of Chicago and its police department at all times relevant had a duty to refrain from willful and wanton retention, supervision and training of its police officers.

157.    The City of Chicago and its police department breached that duty by engaging in willful and wanton conduct in retaining, supervising and training the Individual Defendants.

158.    As a direct and proximate result of the City of Chicago's willful and wanton conduct in retaining, supervising and training the Individual Defendants, the Individual Defendants violated Plaintiff's constitutional rights, as described in detail throughout this Complaint.

## COUNT X – State Law Claim
## Respondeat Superior

159.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

160.    While committing the misconduct alleged in the preceding paragraphs, the Defendants were employees, members, and agents of the Chicago Police Department acting at all relevant times within the scope of their employment.

161.    Defendant City of Chicago is liable as principal for all torts committed by its agents.

## COUNT XI – State Law Claim
## Indemnification

162.    Each of the paragraphs of this Complaint is incorporated as if restated fully herein.

163.    Illinois law provides that public entities are directed to pay any tort judgment for compensatory damages for which employees are liable within the scope of their employment activities.

164.    Defendant Officers are, or were, employees of the Chicago Police Department, who acted within the scope of their employment in committing the misconduct described above.

165.    The City of Chicago is obligated to pay any judgment entered against the Defendant Officers.

WHEREFORE, Plaintiff JOSEPH BASKINS, respectfully requests that this Court enter a judgment in his favor and against Defendants Patrick Gilmore,

44

MICHAEL R. KELLY, MARK JAROCKI and the CITY OF CHICAGO, awarding compensatory damages, attorneys' fees and costs against each Defendant, punitive damages against each of the individual Defendants and any other relief this Court deems just and appropriate.

**JURY DEMAND**

Plaintiff, Joseph E. Baskins hereby demands a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues so triable.

RESPECTFULLY SUBMITTED,

**JOSEPH BASKINS**

By:     /s/ Josh Loevy
        Attorney for Joseph Baskins

Arthur Loevy
Jon Loevy
Steve Art
Josh Loevy
LOEVY & LOEVY
311 N Aberdeen Street
3rd Floor
Chicago, IL 60607
(312) 243-5900
joshl@loevy.com